# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.  14 cv 61624

**GREGORY E. SCHWARTZ PA,**
          **Petitioner/Plaintiff,**

    **vs.**

**DEPARTMENT OF THE TREASURY,**
**INTERNAL REVENUE SERVICE,**

          **Respondent/Defendant.**
_____/

### MOTION TO QUASH SUMMONS

Gregory E. Schwartz PA (hereinafter Schwartz), by and through its undersigned counsel, respectfully moves this Court to quash two summons issued by the Internal Revenue Service (hereinafter the IRS): one issued to Wells Fargo Bank, and the other to Redline Media Group LLC. In support of this motion, Schwartz would show as follows.

On August 3, 2013, Gregory & Rebecca Schwartz engaged Ronald Marini of the law firm of Marini & Associates to represent them before the IRS in an audit of their 2011 Individual Form 1040 tax return. At that time it was believed that the Schwartzes' audit was the result of an IRS investigation of Danny Feder who Gregory Schwartz has a business relationship with. Gregory Schwartz is a personal

injury attorney and Danny Feder is a chiropractor. (Statement of Ronald Marini, Exhibit 1, ¶ 1, hereinafter SRM).

Marini thereafter sent an IRS form 2848 (power of attorney) to the IRS revenue agent and scheduled an initial conference for August 29, 2013. The conference went off as scheduled and agent Craig Lumpkins spent the entire day in Marini's conference room. Marini met with the agent off and on for about four hours. At some point during the conference, Marini asked the agent whether this current audit was a result of an investigation of another taxpayer. Agent Lumpkins indicated that the investigations were related, but would not say anything else on the matter. (SRM ¶ 2 )

Marini provided Agent Lumpkins over 500 pages of bank statements consisting of 18 separate bank accounts (not Gregory E. Schwartz, PA accounts) on a CD ROM, pursuant to an Information Document Request (hereinafter IDR) for all individual bank accounts. Lumpkin stated that because Gregory Schwartz had roughly $250,000 of income from his law practice (which grossed $3 million) and $5 million of gambling winnings, that he would be doing not only an income tax audit of the individuals but also a lifestyle audit (e.g. build the personal financial statement to determine whether their lifestyle was supported by income reported on their form 1040s). (SRM ¶ 3).

Lumpkins noted that Gregory Schwartz increased his relationship with the casino from 2008 – 2011, and also that Schwartzes' lifestyle increased proportionately. Consequently Lumpkins was required to do a further inquiry and analyze the Schwartzes cash flows; where did they originate from, where was it kept, was any of it converted into another asset, and whether all this cash was properly reported on their tax returns. (SRM ¶ 4).

Agent Lumpkins also stated Gregory Schwartz's association with Danny Feder was viewed as suspect because Mr. Lumpkin felt that Feder was  involved in pill mills or pain centers, which throw off substantial cash profits which Schwartz was aiding Federer in processing. (SRM ¶ 5).

Gregory Schwartz in fact sends clients to Danny Feder as a chiropractor and Danny Feder refers patients to Gregory Schwartz, PA as lawyers for recovering personal injury damages. They both also jointly participate in marketing the same target market through a cooperative that allows them to have greater advertising coverage for a lower cost. (SRM ¶ 6).

There is a 1-800 number (1-800 Need Help) which they jointly market, which is targeted at people injured in slip and falls and auto accidents, from which both Gregory Schwartz, PA, and Danny Feder benefit as representing them legally and treating their physical ailments chiropractically. (SRM ¶ 7).

Agent Lumpkins's audit was primarily focused on cash flows and did not request one item of income or expense listed, other than vouching his gambling winnings on the Schwartzes' form 1040, which was supposedly being audited. (SRM ¶ 8).

On November 13, 2013 Gregory Schwartz, PA received an IDR advising it that it was under audit and requesting 11 items. On December 12, 2013, all 11 items were produced (consisting of close to 1000 pages of documentation), including books and records, meeting minutes, tax returns, detailed trial balance, adjusting journal entries, accountant's workpapers, pension plans, depreciation schedules, and explanation of accounting methods, copies of account statements for all bank accounts, except the attorney's trust account which was not provided and redacted from the general ledge provided by the tax payer. (SRM ¶ 9).

Over the next seven months the IRS issued 290 pages of IDR'S to Marini and Associates, PA requesting numerous and various documents from the taxpayer, "in furtherance of the IRS's investigation of the taxpayers correct statement of income." (SRM ¶ 10).

As of February 3rd, 2013, the real objective of the investigation was revealed when the government redacted its summons demanding the production of all bank account information to specific wire transactions pertaining to one individual, Sheldon Burnett. Exhibit 4. Burnett, an attorney and professional gambler is an

acquaintance of both Feder and Schwartz. Both Feder and Burnett are also currently under audit by the IRS.

A summary of the Timeslips of Tax Attorney Ronald A. Marini, Esq., redacted for attorney-client privileged descriptive information, showed that Marini was required to spend 118.8 hours to respond solely to this IRS audit of the taxpayer, which cost Schwartz $59,400 in fees, without associated expenses. (SRM ¶ 11; Exhibit 2).

Since the amount of documentation that Marini & Associates, PA was required to submit on behalf of this taxpayer was so voluminous that it was transmitted mostly electronically via data stick and CD, it was impossible for Marini to get an accurate count of precisely how many pages of documents were required to be sent to the IRS, in response to their various and numerous IDR's. To the best of his knowledge Attorney Marini believes that he provided hundreds (if not more than 1,000) pages on behalf of the taxpayer in response to the various document requests made by the IRS. (SRM ¶ 12).[1]

After spending seven months and causing the taxpayer to submit hundreds, if not thousands of documents, in response to the governments various Information Document Requests (IDR), the government by their own admission, based upon

---

[1] A total of 43 emails were received from or sent to the IRS as they relate to this audit. (SRM ¶13).

5

their current proposed adjustments, are allowing **86.56%** of all the deductions originally claimed by the taxpayer (see computation below) and thereby admitting that the taxpayer's 2011 Form 1120S - US Income Tax Return for an S Corporation, as originally filed, is substantially correct. (SRM 14).[2]

|  |  | | Taxpayer | |
|  |  | IRS Proposed | Stipulated | Contested |
| **Date** | **Description** | **Deficiency** | **Deficiency** | **Deficiency** |
| 6/17/14 | Charitable Contributions | $64,213 | $29,700 | $34,513 |
| 6/17/14 | Depreciation | $41,000 | $20,500 | $20,500 |
| 6/17/14 | Media Group | $214,172 | $0 | $214,172 |
| 6/17/14 | Corporate Gifts | $69,509 | $69,509 | $0 |
| **Total Deficiencies to Date** | | **$388,894** | **$119,709** | **$269,185** |

---

[2] It should be noted that as of November 13, 2013, the date the IRS opened the second audit on Gregory Schwartz, PA, the IRS had not proposed one dollar of adjustments to the individual form 1040s whose audit began in August 2013 and to date they have still not proposed any adjustments to the individual tax returns, which were supposedly the subject of the audit.

| | | |
|---|---|---|
| **Total Expenses Claimed by Taxpayer On Form 1120S - As Originally Filed** | **$2,893,198** | **$2,893,198** |
| **% Dissallowed By IRS** | **13.44%** | **4.14%** |
| **% Allowed By IRS** | **86.56%** | **95.86%** |
| Additional Federal Tax (Rate @ 35%) | **$136,112.90** | **$41,898.15** |
| **Attorney Fees (w/o Exp.) – Pre-Summons** | **$59,400.00** | **$59,400.00** |
| **Percentage of Atty Fee/Tax** | **43.64%** | **141.77%** |

On June 23, 2014, Gregory Schwartz PA received a copy of two summonses issued by the Internal Revenue Service.[3] One was directed to Wells Fargo Bank and sought the production of:

---

[3] Inexplicably both summonses state that they were issued on the 30th day of June, 2014 and returnable by the 30th day of July 2014. In fact, the summonses were issued on June 23, 2014 and were received on June 25, 2014.

Copies of account statements, deposit items, ATM deposits, and wire transfer slips for all trust accounts owned or controlled by the above named entity for the period of January 1, 2011 through December 31, 2011, including but not limited to account #2000008274124.

(Exhibit 3).

The other was directed to Redline Media Group and sought production of:

Please provide copies of the invoices issued to Redline Media Group LLC that correspond to the following payments received from Gregory Schwartz during the 2011 tax year:

| Date | Check# | Account Owner | Amount |
|------|--------|---------------|--------|
| 2/28/2011 | 13859 | Gregory Schwartz PA | 10,000 |
| 3/23/2011 | 13921 | Gregory Schwartz PA | 10,000 |
| 3/23/2011 | 1259 | Gregory Schwartz PA | 75,000 |
| 5/2/2011 | 14027 | Gregory Schwartz PA | 20,000 |
| 6/17/2011 | 1223 | Gregory & | |
| | | Rebecca Schwartz | 50,000 |
| 8/1/2011 | 14029 | Gregory Schwartz PA | 10,000 |
| 9/6/2011 | 14277 | Gregory Schwartz PA | 10,000 |

(Exhit 3).

## MEMORANDUM OF LAW

## I.

## THE RECORD BEFORE THIS COURT DEMONSTRATES THAT THE INTERNAL REVENUE SERVICE IS ACTING IN BAD FAITH AND THAT ENFORCEMENT OF THE SUMMONES THAT ARE THE SUBJECT OF THIS MOTION WOULD CONSTITUTE AN ABUSE OF THIS COURT'S PROCESS

Title 26 U.S.C. §7609(b)(2)(A)  states:

Notwithstanding  any other law or rule of law, any person who is entitled to notice of a  summons under subsection (a) shall have the right to begin a proceeding to  quash such summons not later than the 20th day after the day such notice  is given in the manner provided in subsection (a)(2). In any such  proceeding, the Secretary may seek to compel compliance with the summons.

Title 26 U.S.C. §7609(h)(1) provides:

The United States district court for the district within which the person to  be summoned resides or is found shall have jurisdiction to hear and determine any proceeding brought under subsection (b)(2), (f), or (g). An  order denying the petition shall be deemed a final order which may be  appealed.

Congress has "authorized and required" the IRS "to make the inquiries, determinations, and assessments of all taxes" the Internal Revenue Code imposes. §6201(a). In support of that authority, Congress has granted the Service broad

latitude to issue summonses "[f]or the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax . . . , or collecting any such liability."§7602(a). Such a summons directs a taxpayer or a third party to appear before an IRS official and to provide sworn testimony or produce "books, papers, records, or other data . . . relevant or material to [a tax] inquiry." §7602(a)(1). In that proceeding, the Supreme Court held, the IRS "need only demonstrate good faith in issuing the summons." *United States* v. *Stuart*, 489 U. S. 353, 359 (1989).

In *United States v. Powell,* 379 U.S. 48, 85 S.Ct. 248 (1964), the Supreme Court enunciated the analytical framework that governs enforcement decisions. For the government to establish a prima facie case for enforcement, it must demonstrate that (1) the investigation has a legitimate purpose, (2) the information summoned is relevant to that purpose, (3) the documents sought are not already in the IRS's possession, and (4) the procedural steps required by the tax code have been followed. *Id.* at 57-58, 85 S.Ct. 248.

"The requisite showing is generally made by the submission of the affidavit of the agent who issued the summons and who is seeking enforcement." *United States v. Will,* 671 F.2d 963, 966 (6th Cir.1982). Once the government has made this prima facie showing, the burden shifts to the party being summoned to either disprove the elements of the prima facie case or "demonstrate that judicial

10

enforcement of the summons would otherwise constitute an abuse of the court's process." *United States v. Davis,* 636 F.2d 1028, 1034 (5th Cir.1981).

A person receiving an IRS summons is entitled to contest it in an enforcement proceeding. See *United States* v. *Bisceglia*, 420 U. S. 141, 146 (1975); *Powell*, 379 U. S., at 57–58; *Reisman* v. *Caplin*, 375 U. S. 440, 449 (1964). The power "vested in tax collectors may be abused, as all power" may be abused. *Bisceglia*, 420 U. S., at 146. In recognition of that possibility, Congress made enforcement of an IRS summons contingent on a court's approval. See 26 U. S. C. §7604(b).

Accordingly, the Supreme Court long ago held that courts may ask only whether the IRS issued a summons in good faith, and must eschew any broader role of "oversee[ing] the [IRS's] determinations to investigate." *Powell*, 379 U. S., at 56. So too, the court stated that absent contrary evidence, the IRS can satisfy that standard by submitting a simple affidavit from the investigating agent. See *Stuart*, 489 U. S., at 359–360. However:

> As part of the adversarial process concerning a summons's validity, the taxpayer is entitled to examine an IRS agent *when he can point to specific facts or circumstances plausibly raising an inference of bad faith*. Naked allegations of improper purpose are not enough: The taxpayer must offer some credible evidence supporting his charge. *But circumstantial evidence can suffice to meet that burden; after all, direct evidence of another person's bad faith, at this threshold stage, will rarely if ever be available*. Although bare assertion or conjecture is not enough, neither is a fleshed out case demanded: The taxpayer need only make a showing of facts that give rise to a plausible inference of

improper motive. That standard will ensure inquiry where the facts and circumstances make inquiry appropriate, without turning every summons dispute into a fishing expedition for official wrongdoing.

*United States v. Clark*, 573 U.S.___(2014)(emphasis added).

In *United States v. Monumental Life Insurance Company*, 440 F.3d 729 (6th Cir. 2006) Monumental Life Insurance Company appealed from the district court's order enforcing an administrative summons issued by the Internal Revenue Service (IRS). As in the instant case, the summons requested voluminous documents from Monumental, a third party in the IRS's investigation of Johnson Systems, Inc. In the course of reversing the order of the District Court and quashing the summons, the Sixth Circuit stated:

> Monumental, because it is a third party to the IRS's investigation of the taxpayer Johnson, deserves greater protection against a burdensome summons. *See United States v. Bisceglia,* 420 U.S. 141, 157, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975) (holding that federal courts should scrutinize summonses issued to third parties with extra care) (superseded by statute on other grounds).

*Id.* at 735. The Court quashed the summons finding that Monumental was a third party and that the IRS had sought a voluminous amount of highly sensitive proprietary information, some of which the government already possessed. *Id.* at 736.

In the case before this Court, despite the fact of all the taxpayers cooperation, investment of time and money and the failure of the IRS to prove any material deficiency in tax, the IRS now, in bad faith, having

not found any material adjustments to the taxpayers tax returns as filed, is summoning Schwartz's bank to provide its trust account information and Schwartz's marketing company, Redline Marketing Group, to provide all invoices relating to the taxpayer.

Based upon the IRS's failure to find any material discrepancies in the taxpayers tax returns as filed and based upon the specific information summoned from the bank, we believe the IRS is unjustly causing this taxpayer to incur great expense, not to defend itself, but to help the IRS gather information relating to other taxpayers that are currently under audit. Therefore, we believe that the summonses are not issued in good faith, have nothing to do with determining the taxpayers correct tax liability, and we respectfully request the court find in favor our motion to quash the summonses.

## II.

**THE FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES SHIELDS A TAXPAYER'S BANK ACCOUNT RECORDS FROM PRODUCTION IN THE ABSENCE OF A SEARCH WARRANT ISSUED BY A COURT OF THE UNITED STATES BASED UPON A SHOWING OF PROBABLE CAUSE**

In *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619 (1976) the Supreme Court held that a depositor does not have a reasonable expectation of privacy in the records of his account maintained by a bank pursuant to the Bank Secrecy Act.

Justice Powell, writing for the majority of the Court, reasoned that there was no expectation of privacy in the contents of a bank record because "checks are not confidential communications but negotiable instruments to be used in commercial transactions." Specifically, "financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." As such, "The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government." *Id.* at 443-444.

In so holding, the Court did not consider the extent to which the government can obtain information about a person's most confidential affairs through an analysis of bank account records. But such an analysis was recently made by Justice Roberts, speaking for a unanimous Court in *Riley v. California*. In *Riley* the court held that the Fourth Amendment prohibits the government from examining the contents of a person's cell phone absent a warrant.

In *Riley* Justice Robert's rejected the government's argument that an individual did not enjoy an expectation of privacy in those records maintained in electronic devices carried on the person. In so holding, Justice Roberts analyzed the expectation of privacy in a very different way than did Justice Powell. According to Justice Roberts, the arrest of an individual may diminish the person's expectation of privacy, but it does not do away with it entirely. Slip op. at 20. Justice Roberts

14

pointed out that cell phones are mini-computers which just "happen to have the capacity to be used as a telephone." This gives people the ability to keep on their person "every picture they have taken, or every book or article they have read," which otherwise they would have to carry in a trunk, an item that the Court's previous cases held requires the government to obtain a warrant to search.

Seizing the contents of a cell phone gives the government the ability to reconstruct the sum of an individual's private life, "reconstructed through a thousand photographs labeled with dates, locations, and descriptions…." Justice Roberts observed that while "A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone. *Id.* at 23. Indeed, "it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate." *Id*.

For example, the government could readily learn everything about an individual's "private interests or concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMd." Further, "Data on a cell phone can also reveal where a person has been."  *Id.* As a result a person's "specific movements down to the minute, not only around town but also within a particular

building," could be uncovered. *Id.* at 24. A mere examination of the "apps" found on a cell phone could reveal whether a person was a Democrat or a Republican, whether they had an addiction, or were pregnant, etc. *Id.*

A similar analysis was recently employed by the Eleventh Circuit Court of Appeals in *United States v. Quartavious Davis*, Case No. 12-12928 (11th Cir. June 11, 2014). In that case the defendant (charged with bank robbery) argued that the trial court erred in admitting location evidence based on stored cell site information obtained by the prosecution without a warrant, in violation of his Fourth Amendment rights. The Eleventh Circuit agreed. The Eleventh Circuit relied heavily on the decision of the District of Columbia Circuit's decision in *United States v. Maynard*, 615 F.3d 544, 549 (D.C. Cir. 2010)(certiorari granted, affirmed on other grounds, *United States v. Jones*, ___U.S.___, 132 S.Ct. 945 (2012):

> The Court of Appeals for the District of Columbia Circuit reviewed the Fourth Amendment issue and noted that the prosecution had employed the GPS device to track Jones's "movements continuously for a month.". The court considered the government's argument that each of Jones's movements over the month was exposed to the public, and that therefore, he had no reasonable expectation of privacy in them. The court rejected this argument, noting that "the whole of one's movements over the course of a month . . . reveals far more than the individual movements that it comprises. The difference is not one of degree but of kind, for no single journey reveals the habits and patterns that mark the distinction between a day in the life and a way of life, nor the departure from a routine that . . . may reveal even more." *Id.* at 561–62.
>
> By way of example, the court noted that "[r]epeated visits to a church, a gym, a bar, or a bookie tell a story not told by a single visit . . . ." *Id.* at 562. The court noted further that "the sequence of a person's

16

movements can reveal still more; a single trip to a gynecologist's office tells little about a woman, but that trip followed a few weeks later by a visit to a baby supply store tells a different story." *Id.*

The court recalled the "mosaic theory" often relied upon by the government "in cases involving national security information." *Id.* As the Supreme Court has observed in that context, "what may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context." *CIA v. Simms*, 471 U.S. 159, 170 (1985) (internal quotation marks and citations omitted). The circuit reasoned that although each element of Jones's movements throughout the month might have been exposed to the public, the "aggregation of [those] movements over the course of a month," was not so exposed, and his expectation of privacy was reasonable. *Maynard*, 615 F.3d at 563.

Slip Op. 14-15.

The Eleventh Circuit pointed out that when the Supreme Court was first asked to protect communications on an expectation of privacy theory, the court rejected the notion. *Olmstead v. United States*, 277 U.S. 438 (1928)(holding that Fourth Amendment was not violated in the absence of a trespass). Ultimately that theory prevailed, *Katz v. United States*, 389 U.S. 347 (1967)(finding Fourth Amendment violation in wiretapping of conversation despite absence of a trespass). Indeed the whole notion of what constitutes a reasonable expectation of privacy, what Samuel Warren and Louis Brandeis called "the right to be left alone," has evolved from when they first argued for the recognition of a common law right to

privacy in their seminal article published in the Harvard Law Review in 1891.[4]

Indeed as Professor Ken Gormley has observed:

> The key to understanding legal privacy as it has developed over 100 years of American life, it will be argued, is to understand that its meaning is heavily driven by the events of history. What constitutes an engine of privacy in the year 1890, is not necessarily the same thing which formulates a societal notion of privacy in the United States in 1939, or 1968 or 1973. Rather, like a strawberry geranium--saxifraga sarmentosa--which creeps and sprouts new shoots at unexpected intervals throughout its lifetime, privacy in the United States has led a similar vine-like existence, creating a variety of different offshoots depending upon the particular climate of American life.

Ken Gormley, One Hundred Years of Privacy, 1992 Wis.L.Rev. 1335, 1340 (1992).

Almost everything that can be said regarding the violation of an individual's privacy resulting from the government's search of the person's cell phone can be said about a search of a person's bank accounts. One can even trace their movements through time through their debit card charges. Consequently, to the extent that it is reasonable for society to expect that the government have a search warrant as a condition of invading that zone of privacy, the same could be said of searches of an individual's banking records. As a result of the Court's reasoning in

---

[4] Samuel D. Warren & Louis D. Brandeis, The Right to Privacy, 4 Harv.L.Rev. 193 (1890).

*Riley*, this Court should hold that *Miller's* narrow view of society's expectations of privacy is no longer valid.[5]

## III.

### EVEN IF THIS COURT ORDERS THE SUMMONSES ENFORCED THE SUMMONS TO WELLS FARGO BANK MUST BE REDACTED IN ORDER TO PRESERVE THE ATTORNEY CLIENT PRIVILEGE ATTENDANT TO GREGORY E. SCHWARTZ P.A. TRUST ACCOUNT

The summons to Wells Fargo Bank is for the records of the Gregory E. Schwartz P.A. Trust Account. Because these records pertain to various clients of Gregory E. Schwartz P.A., counsel should be given the opportunity to redact the information in order to preserve the Attorney Client privilege.

---

[5] What Brandeis foresaw when he viewed the Constitution as being flexible enough to include new forms of Fourth Amendment privacy, which could never have been envisioned when early Englishmen spoke of "home is your castle," was a vision not shared by society as a whole in 1928. Like other shoots on the privacy vine, it was not until the events of history coalesced to make this a matter one of fundamental concern on a societal scale, deeply sensed after years of experiencing the effects of humankind's own inventiveness, that Fourth Amendment privacy took shape in American jurisprudence. That, of course, did not fall into place until Katz v. United States [FN135] was decided by the Supreme Court in 1967.

One Hundred Years of Privacy at 1362.

## IV.

## REQUEST FOR ATTORNEY'S FEES

Should this Court grant the relief requested herein and quash the summones, we request that this Court award reasonable attorney's fees and administrative costs incurred in the connection with these proceedings.

Respectfully submitted,

/s Jon May, Esq.____
JON MAY ESQUIRE
FBN 276571
4000 Hollywood Blvd.
Suite 555-S
Hollywood, FL 33021
954.439.6500

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed via electronic filing using the CM/ECF system with the Clerk of the Court which sent e-mail notification of such filing to all CM/ECF participants in this case and by mail to Agent Craig Lumpkins, IRS, 1700 Palm Beach Lakes Blvd., Suite 500, West Palm Beach, FL 33401, Wells Fargo, Custodian of Records, 4600 Sheridan Street, Hollywood, FL 33021 and Redline Media Group, LLC, 1951 Tiger Tail Blvd., Dania Beach, FL 33004this 14TH day of July 2014.

/s Jon May, Esq.____
JON MAY ESQUIRE